# STEVE ZISSOU

ATTORNEY AT LAW
42-40 BELL BOULEVARD, SUITE 302
BAYSIDE, NY 11361
(718) 279-4500
FACSIMILE (718) 281-0850
EMAIL: STEVEZISSOU@VERIZON.NET

October 16, 2006

Honorable Thomas P. Griesa
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:   United States of America v. James Rattoballi
>         Criminal Docket No. 02-1385(TPG)

Dear Judge Griesa

James Rattoballi is scheduled to be sentenced by this Court on Monday, October 30, 2006, at 4:30 p.m., following his plea of guilty to Conspiracy to Rig Bids in violation of 15 U.S.C. 1 and Mail Fraud, in violation of 18 U.S.C. § 371.

## Introduction

On October 23, 2002, James Rattoballi was charged in a two-count Information with conspiring to rig bids in violation of 15 U.S.C. § 1 and conspiring to commit mail fraud in violation of 18 U.S.C. § 371. Pursuant to a plea agreement with the government, he pled guilty on October 23, 2002 to both counts. On February 10, 2005, he appeared before this Court for sentencing. This Court then sentenced Rattoballi to a non-Guidelines sentence of five years probation, one year of home confinement and $155,000 in restitution. No fine was imposed.

The government appealed the portion of this Court's judgment which imposed its sentence.  In the brief filed with the United States Court of Appeals for the Second Circuit, the government argued that this Court had ignored the <u>Booker/Crosby</u> sentencing framework; that this Court had failed to provide a written statement of reasons for imposing a sentence below the Guidelines range; that this Court's failure to impose any prison term was unreasonable; that a sentence that differed substantially from the Advisory Guidelines Range without a reasoned explanation was unreasonable; that this Court's finding of inability to pay a fine was erroneous and that the failure to impose any fine was unreasonable, and that this Court had ignored other important §3553 (a) factors.   Thereafter, counsel for Rattoballi submitted an answering brief and the government submitted a reply brief.

Oral argument was held by the United States Court of Appeals for the Second Circuit on November 23, 2005.  By the time the Court of Appeals issued its opinion on June 15, 2006, Rattoballi had successfully completed his one year of home confinement and had paid a substantial portion of his restitution.  In its opinion, the Court of Appeals vacated Rattoballi's sentence and remanded the case to this Court for resentencing consistent with its opinion.  <u>United States v. Rattoballi</u>, 452 F.3d 127 (2d Cir. 2006).   This memorandum analyzes the <u>Rattoballi</u> opinion and subsequent opinions issued by the Court of Appeals.  It also contains recommendations for Rattoballi's resentencing which would effectively comply with the Court of Appeals' opinion.

## Analysis of United States v. Rattoballi, 452 F.3d 127 (2d Cir. 2006)

Citing the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005) and its own decision in <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the Court of Appeals reiterates the standard of review for reviewing sentencing decisions as "reasonableness".  Much of the remainder of the opinion then discusses the criteria the Court will consider in determining whether a particular sentence was reasonable.  Though insisting that a reviewing court will not act as a "rubber stamp" in evaluating a district judge's sentencing decision, the Court continues to assert that its review of such decisions will be "deferential".  In so ruling, it cites its earlier decision in <u>United States v. Canova</u>, 412 F.3d 331, 350 (2d Cir. 2005) in which it held that following <u>Booker</u>, district judges should be accorded greater flexibility in discharging their duty to impose appropriate sentences.

Nevertheless, the Court stresses the continued importance of the U.S. Sentencing Guidelines, and any policy statements issued by the Sentencing Commission.   Noting that the Guidelines "are an expression of popular political will about sentencing" and "represent approximately two decades of close attention to federal sentencing policy", the Court declares that it "will view as inherently suspect a non-Guidelines sentence that rests primarily upon factors that are not unique or personal to a particular defendant, but instead reflects attributes common to all defendants".   Moreover, though the Court refuses to require district judges to "offer a more compelling accounting the farther a sentence deviates from the advisory Guidelines range", it emphasizes that appellate review of sentences depends upon the clarity and comprehensiveness of the reasons given by a district judge for a non-Guidelines sentence.   Based on this proposition, the Court of Appeals then concludes that this Court failed to offer sufficiently compelling reasons for imposing the non-Guidelines sentence in this case.

## The Faults in Rattoballi's Sentencing Determination

The Court of Appeals lists five criticisms of this Court's determination of Rattoballi's sentencing determination.   They are:

1.      This Court's purported reliance on the finding that Rattoballi suffered "the indignity and ill-repute associated with a criminal conviction", a factor common to all defendants in criminal cases.   This criticism appears to be based on comments made by this Court during the sentencing proceeding when it stated, "if nothing else were done to Mr. Rattoballi, this case has inflicted punishment.   It has been hanging over him for a period of three years" (Sent. at 53).   Therefore, it would appear that standing alone, the shame experienced by Rattoballi as a result of his prosecution in this case would not be sufficient to justify a non-Guidelines sentence, unless it could be shown that he suffered a degree of degradation that was greater than most similarly situated defendants.   For example, if Rattoballi were subjected to the type of notoriety not generally suffered by defendants charged with similar crimes, there would seem to be no reason why this Court would be barred from according some consideration to that circumstance.

2.      This Court's failure to consider the Sentencing Commission's policy statements regarding antitrust violators.   The Court of Appeals notes that the Sentencing Commission has stated that "in very few cases will the

guidelines not require that some confinement [for antitrust violations] be imposed" and that jail terms "reflect the serious nature of and the difficulty of detecting such violations".  However, the Court of Appeals acknowledges that this Court "is not required to adhere to the policy statements promulgated by the Commission".  What is required is that this Court consider those statements and weigh them in conjunction with any "extraordinary circumstances particular to Rattoballi and not common to other similarly situated defendants."

      3.    This Court's purported reliance on the finding that "Rattoballi's business would 'absolutely end' if Rattoballi was sentenced to a term of imprisonment".  The Court of Appeals actually found two faults with this finding.

      a.    The Court of Appeals found there was an insufficient record to support the determination that Rattoballi's company would come to an end if Rattoballi were imprisoned.  Admittedly, much more evidence could have been submitted to this Court to support this determination.  Although Rattoballi's partner, Robert N. Katz submitted a letter to this Court prior to sentencing, stating that, "I would not be in business, nor would I stay in business, if Jim [Rattoballi] were not there next to me", the government argued, and the Court of Appeals apparently agreed, that more would be needed to establish that Rattoballi was indispensable to the continued operation of Print Technical Group, Inc.

      b.    The Court of Appeals further opined that it was "disinclined to accord the prospect of business failure decisive weight when it is a direct function of a criminal investigation that had its origins in the defendant's own unlawful conduct".  Read in conjunction with its other criticism, the Court of Appeals appears to be cautioning that even if it is demonstrated that Rattoballi's imprisonment would likely result in the cessation of operations of Print Technical Group, Inc., that circumstance alone might not be sufficient to warrant the imposition of a non-Guidelines sentence.  Once again, the Court of Appeals is suggesting that before it can uphold a non-Guidelines sentence as reasonable, it must be satisfied that extraordinary circumstances were presented to this Court which justify the imposition of such a sentence.

4.    This Court's finding that Rattoballi agreed to plead guilty and eventually admitted to all wrongdoing.  This criticism was based on this Court's comments at the sentencing proceeding that, "Despite the difficulty and the delay in coming clean with the whole range of criminal conduct, this defendant has pleaded guilty, and he has now, I believe, admitted the full range of his criminal conduct.  He did not persist in denying, he did not force the government to go to trial, and that has always been regarded by courts as a very substantial matter" (Sent. at 53).  Because this Court had determined that Rattoballi should receive a two-level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility, the Court of Appeals concluded that imposing a non-Guidelines sentence on this basis would "give him credit for cooperation twice" and "reward , the defendant's deliberate withholding of information".

Based upon the record with which the Court of Appeals was confronted, its criticism on this point appears to be unassailable.  However, it is doubtful that when this Court made those comments, it intended that Rattoballi's guilty plea and full admission of guilt were, by themselves, sufficient reasons for imposing the sentence it ultimately selected.  Though this Court's characterization of Rattoballi's guilty plea as "a very substantial matter" was not inaccurate, it probably led the Court of Appeals to conclude that undue weight had been attached to that occurrence.   It seems unlikely that the Court of Appeals would find fault with this Court's reliance on this factor if it were made clear that it was not the paramount consideration that prompted this Court to arrive at its sentencing determination and that other factors such as Rattoballi's deep and sincere expression of remorse for his crimes and for his withholding of information from the government were considered in determining that a non-Guidelines sentence was warranted.

5.    This Court's reliance on the finding that Rattoballi's culpability was less substantial than Mosallem's.  While the Court of Appeals acknowledges that "a defendant's culpability is always relevant in imposing sentence" it concludes that this Court did not offer sufficient justification for imposing a sentence that did not include a term of imprisonment.  Once again, the Court of Appeals' assessment of the existing record is understandable.  At sentencing, this Court noted that Mosallem "was a person who exerted an enormous amount of pressure upon other people and got them in trouble.  They, of course, should not have gotten into trouble.  They should have resisted.  They should have done other things.  But Mosallen's determination, his demands, his insatiable insistence were very difficult to deal with.  Again,

as I have said, no excuse, but he's part of the picture." Unfortunately, this Court's comments relative to Mossalem's misconduct and the huge influence he exerted on Rattoballi in involving him in the charged offenses only skim the surface. A fuller recitation of the facts leading to the offense in question would compellingly demonstrate the predicament in which Mossalem placed Rattoballi when he made greater and greater demands that drew him into the offenses committed. Greater elaboration on this point would establish that while Rattoballi's offense were certainly not justified, it was in large part induced by the pressure brought on him by Mossalem, an extraordinary circumstance that would place Rattoballi's conduct in a far more sympathetic light.

**The Failure to Include a Statement of Reasons
in the Written Judgment**

The Court of Appeals finds that pursuant to 18 U.S.C. § 3553 (c) (2), a district judge is required to set forth its specific reason for imposing a non-Guidelines sentence in the written order of judgment and commitment, as well as in open court. However, the Court of Appeals declines to rule that the failure to include a statement of reasons in the written judgment requires a remand to comply with that requirement since it has ordered Rattoballi's case to be remanded for the aforementioned reasons. In any event, it would certainly be prudent for this Court to set forth its specific reasons for imposing a non-Guidelines sentence in the written order of judgment and commitment to be filed upon Rattoballi's resentencing.

Recently the Honorable Jed S. Rakoff, United States District Judge (SDNY) encountered a similar situation in United States v. Adelson, 05 Cr. 325 (July 20, 2006). Judge Rakoff imposed a non-guidelines sentence well below the sentencing range of life in prison that had been urged by the government. Instead, on May 30, 2006, Judge Rakoff imposed a sentence of 42 months, among other conditions. At the time of the sentence, Judge Rakoff set forth on the record the multiple reasons for his determinations. Shortly thereafter, the Circuit decided the government's appeal in the instant case. As a result of the lengthy dicta contained in Rattoballi, Judge Rakoff issued an order that explained in detail the reasons for the sentence he had imposed and made it a part of the judgement.

## The  Decision  not  to  Impose  a  Fine

The Court of Appeals finds that following <u>Booker</u>, a district judge has discretion to determine whether to impose a fine pursuant to 18 U.S.C. § 3571 (a).  However, because Rattoballi stated at the time of his sentencing that he had "accumulated some modest wealth" and was "capable of paying a modest fine", the Court of Appeals holds that on remand, this Court must carefully consider Rattoballi's present financial circumstances along with the Sentencing Commission's stated belief that "'[s]ubstantial fines are an essential part of the sentence' for antitrust offenders".  Then, if this Court determines that Rattoballi lacks the ability to pay a fine, it should consider ordering him to perform community service in lieu of a fine pursuant to the Sentencing Commission's policy statement.

## The  Lessons  of  Rattoballi  and
## Subsequent  Developments  in  the  Circuit

In <u>Rattoballi</u>, the Court of Appeals seemed intent on reining in this Court's discretion in determining an appropriate sentence.  However, the Court of Appeals certainly did not suggest that a Guidelines sentence would be the only appropriate sentence that might be imposed.  Nor did the Court of Appeals suggest that a sentence below the Guidelines range would be inappropriate, so long as this Court sets forth its reasons for a non-Guidelines sentence in greater detail than was originally done.

A review of some of the opinions issued by the Court of Appeals after <u>Rattoballi</u> reveals some tension within the Circuit in setting forth the standards for determining the reasonableness of non-Guidelines sentences.  For example, in <u>United States v. Jones</u>, 460 F.3d 191 (2d Cir. 2006), a case decided less than two months after <u>Rattoballi</u>, the defendant was charged with being a felon in possession of firearms and possession of marijuana. Following the defendant's guilty plea, the district judge found that the applicable Guidelines range was 30 to 37 months.  However, at sentencing, the judge concluded that a non-Guidelines sentence of 15 months imprisonment, followed by three years of supervised release would be more appropriate than a Guidelines sentence.  In support of that conclusion, the judge noted that the defendant had a "consistent work ethic" and a "very good and positive" adjustment to state probation.  In addition, the judge stated, "I just had a gut feeling about you .... I still have the sense that Eric Jones is capable of doing much better".  <u>Id</u>. at 194.  The government then appealed Jones' sentence.

Page 8 of 19

Though acknowledging that the district judge in <u>Jones</u> had not given a specific articulation as to why a 15 month prison sentence was appropriate, the Court of Appeals nevertheless affirmed the defendant's sentence, holding:

> "Although the sentencing judge is obliged to consider all of the sentencing factors outlined section 3553 (a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness."

<u>Id</u>. at 195.

Moreover, the <u>Jones</u> court reaffirmed earlier rulings by the Court which recognized the greater flexibility according sentencing judges after <u>Booker</u> when it noted:

> "Obviously, the discretion that *Booker* accords sentencing judges to impose non-Guidelines sentences cannot be an escalator that only goes up. Of course, in any particular case a sentence, assessed even against the flexible standard of reasonableness, might be so far above or below a Guidelines range and so inadequately explained by the sentencing judge as to require rejection on appeal. But we continue to believe that we will 'encounter such circumstances infrequently.'"

<u>Id</u>. at 196, <u>citing</u>, <u>United States v. Fairclough</u>, 439 F.3d 76, 80 (2d Cir. 2006), <u>quoting</u>, <u>United States v. Fleming</u>, 397 F.3d 95, 100 (2d Cir. 2005).

Similarly, in <u>United States v. Pereira</u>,      F.3d      , Dkt. No. 05-5969-cr (2d Cir. 10-13-06), the defendant challenged the reasonableness of his sentence, claiming that the district judge failed to consider each of the §3553 (a) factors. While the Court of Appeals observed that the district judge's consideration of those factors had been somewhat "cursory", it upheld the

sentence and reaffirmed the principle that it would not require judges to explain or enumerate how consideration of §3553 (a) factors was conducted. See also, United States v. Nurse,     F.3d    , Dkt. No. 05-4976-cr (2d Cir. 8-17-06) (rejecting any requirement that district judges conduct robotic incantations of the §3553 (a) factors to comply with the §3553 [c] [2] requirement that the specific reason for the imposition of a sentence different from the advisory Guidelines sentence be set forth in open court and in the written order of judgment and commitment.

In sum, while the Court of Appeals' opinion in Rattoballi took issue with the depth of this Court's findings, it did not and could not circumscribe this Court's discretion in a manner that would preclude this Court from including in its consideration of the sentencing factors its own sense of what is a fair and just sentence under the circumstances.  Imposing such limitations would be inconsistent with the pronouncements of Booker and Crosby.  Nor could the Court of Appeals, consistent with its own precedent, dictate to this Court the weight it could attach to any appropriate sentencing factor.  In any event, Rattoballi is prepared to supply this Court with additional reasons why the imposition of a non-Guidelines sentence below the Guidelines range would be just and proper.  Those reasons will now be set forth herein.

## 1.   <u>Downward Departures/Alternative Sentences</u>

There are several strong grounds for departure. They fall into the following categories:

(a) Rattoballi has already served a substantial sentence; (b) the loss guideline's overstatement of the seriousness of the offense; (c) Rattoballi's exceptional charitable work, community service, and generosity with time; (d) Rattoballi's substantial cooperation with the government; (e) The effect that a jail sentence would have on Rattoballi's business and employees;

All of the facts that support these four grounds for departure are also relevant to variances under other § 3553(a) factors (that is, subsections (1), (2), (3), and (6)). Rather than discuss the same facts and make similar arguments twice—first as a matter of "traditional" departure doctrine, and second under the post-Booker advisory regime—we believe it is more efficient and less confusing if we discuss these subjects once.

Page 10 of 19

## 2.  Other Required Considerations

In addition to considering the Guidelines sentence, this court must also consider several other statutory factors (e.g. § 3553(a)(1), (a)(2), (a)(3), (a)(6), (a)(7) to determine the sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.  When these factors are considered in their totality, it becomes abundantly clear that the statutory mandate has already been satisfied by the sentence that Rattoballi originally received and has served.

## a.  Rattoballi Has Already Served a Substantial Sentence

As noted above, Mr. Rattoballi was sentenced to, among other things, 5 years probation, restitution, and one year of house arrest.   He has already served that portion of his sentence that required him to spend a year under house arrest.   While the government filed a successful appeal of this sentence, they did not seek a stay of the execution of any part of it.   Mr. Rattoballi has completed that portion of his sentence that required him to be under house arrest and has made periodic restitution payments in accordance with the Judgement.   He has otherwise complied with the conditions of probation and has continued to lead a productive and law abiding life.   As a result of the government's decision not to seek a stay of the execution of the sentence, at the very least subsections (2) (A), (B),( C) and (D) of § 3553 have been satisfied.   Clearly, Mr. Rattoballi has served a sentence that reflects 'the seriousness of the offense" has promoted "respect for the law" provided "just punishment for the offense" and at the same time has afforded "adequate deterrence to criminal conduct."   Mr. Rattoballi's complete compliance with the conditions of his sentence and his law abiding life make it clear as cavil that this sentence has also protected the public "from further crimes of the defendant."    All of these circumstances confirm the wisdom this Court demonstrated by imposing such a substantial sentence in the first place.

## b.  Loss Guideline's Overstatement of Seriousness of Offense

The court's finding, which we do not disagree with, that Rattoballi was responsible for an intended loss of $350,000.00, thus enhancing the Guideline range under Guideline §2F1.1(b)(1)(J). There is good reason to reduce the sentence by most, if not all, of those levels because in this case the loss guideline vastly overstates the seriousness of the offense. This was a recognized ground for departure before Booker, and the same rationale applies

under 18 U.S.C. § 3553(a)(2)(A) in conjunction with § 3553(a)(1). At the original sentencing, under a preponderance standard, this Court enhanced Rattoballi's offense level by 9 levels based on an intended loss of between $350,000 and $500,000. The government argued the figure was approximately $700,000.

Section 2F1 . 1(b)(1) aims to "measure the gravity of the offense by formulating a sliding scale that increases a defendant's probable punishment in rough proportion to the victims' financial loss (actual or intended). Thus, amount of loss becomes a proxy for the seriousness of an offense." United States v. Lilly, 13 F.3d 15, 19 (1st Cir. 1994). But this proxy is not perfect. As a result, the Commission left open the possibility of departure because "the loss determined under 2F1.1(b)(1) may overstate the seriousness of the offense." See U.S.S.G. § 2F1.1 cmt. n.10; see also United States v. Stockheimer, 157 F.3d 1082, 1091-92 (7th Cir. 1 998) (vacating decision not to depart where loss enhancement outweighed seriousness of offense and sentencing court erroneously believed it lacked authority to depart). A departure or variance is warranted on this ground because the loss calculation is disproportionate to Rattoballi's personal culpability and gain and distorted by extraneous causes that had no relation to the alleged conspiracy.

A nine-level enhancement for loss is disproportionate to Rattoballi's personal culpability. As the district court found, it was Mosallem, not Rattoballi, who was the conspiracy's prime architect.  Although Rattoballi was involved in certain events, the evidence showed that his participation in the formulation and implementation of the plan was extremely limited. Additionally, the loss is disproportionate to Rattoballi's personal gain. He was, as the government has repeatedly characterized him, a "giver" in these events and not a "taker" as the receivers of kickbacks had been described. He did not directly receive any of the amounts that others received and the amount that he paid back to Mosallem came not from any extraordinary gain but from the modest profit that his company received for providing the work that it was awarded.

The sentence should also reflect that Rattoballi's conduct was not the sole cause of the calculated loss. The evidence overwhelmingly demonstrated that Rattoballi was among a groug of businessmen who were forced to pay substantial kickbacks to satisfy the insatiable greed demonstrated by Mosallem and others at Grey Advertising.

Page 12 of 19

### c.    Rattoballi's Exceptional Charitable Work, Community Service, and Generosity With Time, and Assistance to Others.

Mr. Rattoballi is a 64 year old  American Citizen and a veteran of the United States Navy. He is married and living with his wife, Maureen Ward, in the home they have owned on Long Island for 37 years.  Together, they have raised three sons: James, age 39, who lives in Bedford, NY and is employed as a Westchester County police officer; Richard, age 37, who lives in Baldwin, NY and works for Print Technical Group; and Paul, age 35, who is an advertising executive.  He has never before been arrested or otherwise charged with a crime.

Mr. Rattoballi has lived his whole life in the New York Area. He has been a good and loving husband,  father, little league coach, basketball coach as well the longtime volunteer director of the Christian Youth Organization's youth basketball program.   In this position and while raising a family and running a business, he also found the time to coordinate the entire CYO Basketball program for his local church, St. Thomas the Apostle. For five years Mr. Rattoballi supervised all of the coaches and their teams and he did so long after his own sons had left the program.   During this time, as his nephew, Anthony, writes in a letter to your Honor, Mr. Rattoballi "emphasized sportsmanship and camaraderie."

Mr. Rattoballi was born in New York.  After graduating from high school in Floral Park, he received an associates degree in graphic arts and printing from New York City Community College in 1962. He enlisted in the United States Navy in 1963 and was honorably discharged in 1965. Thereafter, he attended Hofstra University.   Mr. Rattoballi is presently a part owner of Print Technical Group (hereinafter PTG), a company established in 1990 and located in Manhattan.  He entered the advertising/printing business in the early 1960s.[1]

Rattoballi's exceptional and unique record warrants a substantial departure (or, in the advisory regime, a substantial statutory variance) from the advisory guideline range. Although a defendant's "prior good works" are not ordinarily relevant under the Guidelines, a sentencing court may depart downward if the defendant's record of charitable work and community service

---

[1]  Attached to this memorandum are various letters and documents that demonstrate just a small portion of what Mr. Rattoballi has accomplished during his lifetime.

is extraordinary. See U.S.S.G. § 5H1 .11; see also § lB1 .4 ("In determining . . . whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."). An "extraordinary good works" finding is particularly appropriate where a defendant displays exceptional generosity not only in terms of money, but also in terms of time. See United States v. Serafini, 233 F.3d 758, 773 (3d Cir. 2000) (affirming downward departure where convicted state legislator showed numerous prior good works performed for his constituents). In a post-Booker advisory regime, Rattoballi's record undoubtedly may be considered in tailoring an appropriate sentence below the guidelines range. See 18 U.S.C. §3553(a), 3661.

Indeed, as the letters of support that have been written to the Court overwhelmingly demonstrate, Rattoballi's record is certainly exceptional. Since he was a young man, Rattoballi has devoted himself to serving others. This service has taken myriad forms over the years but the unifying characteristic has been humble selflessness, driven by a devotion to his family his employees and the people in his community.     For example, in a letter to the Court, Peter Florio writes the following of Mr. Rattoballi:

> I have known Jim Rattoballi for over eighteen years, both on a professional and personal basis. During that time, I have come to know him as a man of character, whose honesty, ntegrity and fair dealings in business, as well as his devotion to family and friends are second to none.
>
> In my professional association with him, Jim has exhibited the admirable qualities of the prototypical entrepreneur   hard working and dedicated without sacrificing his principles or relationships with his family. He has consistently shown concern and caring for his employees, taking the position of "doing the right thing" for them, even when it might not have been in his best interest to do so. He has always been forthright and honest in his dealings with me as well.

And a 20 year employee of Print technical Group, Lamont Beaubien, wrote that:

> Jim made me feel more than an employee, He make me feel part of his family. Which in turn showed more love and respect for people under and over his status. I've learned to appreciate sometimes the better things in life without regards to the best of materialistic values.

> The man I continue to work for is the man of great vision and his continue growing generosity.

Nor is this the isolated sentiment of a single employee.   Carmen Colon, another employee, writes that:

> In the 5 years at The Print Technical Group, I can honestly say that Mr. James Rattoballi, and even thought he is my boss, He too is a friend to myself and my family. In all this time he has proven himself and show nothing less than the highest level of honesty and outstanding character.

And yet another employee, Paul Martin, wrote of his boss that:

> Jim and I have spent many hours together on projects as well as discussing family, children and life outside work as well as the task at hand. Jim's time and advice has not only been valuable in the business sense, but also in managing with the everyday of family life. Jim's "don't be greedy", "don't take advantage", ethic has been one to follow. Jim treats everyone fairly.

> When my mom died a few years back, Jim was there immediately, which meant a lot to me. Whether in work or outside I'm proud and grateful to call Jim Rattoballi my friend. If there were anything I could do to help Jim, I would.

Other people who knew him in this capacity referred to him as a "father figure" and the most "caring person I ever came across."

People outside of his company also were impressed by the devotion that Mr. Rattoballi demonstrated to his employees.   In his letter, Vincent Longo, the owner of Nugent Printing, wrote that Mr. Rattoballi:

> has shown himself to be loyal. I have long admired his loyalty to his employees, friends and especially his family. His family has always been a large part of his success. I have gotten to know 2 of his 3 sons and both have become successful thanks to Jim's mentoring them. I don't know of a single employees of Jim's that has been fired or let go, even at times were his business was not doing well. He kept them on staff even when he couldn't afford to.

Among the people who know him best, Frank Barbagallo, who has know James Rattoballi for more than 30 years, writes unequivocally that Jim Rattoballi:

> is the most kind, caring and giving person I have ever known. He has come to my side to help me when I was ill, needed emotional support and also financial help. I cannot say that about many other people I know.   My wife and I feel extremely fortunate to have Jim as our best friend, it very rare to know and be close to such a kind, responsible, generous, caring, and religious individual such as Jim Rattoballi.

And another person who has also known him for 30 years, Marc Scarpelli, writes that:

> I have trusted his knowledge and judgment as far back as his coaching days in CYO basketball when I was a young point guard. Throughout my high school and college years, Jim was always available for advice on many things life threw at me. On a professional level, I have worked with Jim in the same industry

for the past 10 years. He has been more than
generous in sharing his vast knowledge of printing
and advertising as well as pointing me in the right
direction when accepting positions with various
agencies. He is honest, caring and compassionate in
all aspects of his life and I hope to continue our
friendship for a long time.

**(d)    Rattoballi's Substantial Cooperation With The Government**

In or about January of 2002, Mr. Rattoballi's company, PTG was
served with a grand jury subpoena issued by a federal grand jury sitting in the
Southern District of New York.  Within a short period of time, Mr. Rattoballi
began to cooperate with the government.  On October 23, 2002, he appeared
before the Honorable Debra Freeman, United States Magistrate Judge and
entered a guilty plea pursuant to a cooperation agreement with the
government.[2]   Over the next two years, Mr. Rattoballi provided substantial
assistance to the government in the form of debriefings with defense counsel
and the attorney for the government, and by supplying the government with
the documents necessary to make the case against the target of the
investigation.  Mr. Rattoballi was also prepared to testify at trial, if necessary.

The primary target of the investigation was Mitchell Mosallem, an
executive vice-president in the graphic services department of Grey Advertising.
Mosallem was sentenced to 70 months imprisonment.  He was also ordered to
pay restitution of $247,000.00.  The evidence showed that Mosallem and other
employees at Grey viewed their clients as nothing more than opportunities to
enrich themselves in varying degrees.  Mosallem used his position to enrich
himself by extorting kickbacks from otherwise law-abiding businessmen such
as Mr. Rattoballi.  Mr. Rattoballi was one of many vendors who was forced
to pay substantial sums of money to Mosallem in order to become a so-called
"preferred vendor" for the services that Grey needed for its clients.  Most of
the time, contrary to the suggestion that the government advances in the
presentence report, the funds needed to pay Mosallem came from the roughly
twenty percent (20%) profit that PTG earned on the jobs for which they were
allowed to bid.  Indeed, Mosallem demanded a tribute of as much as five
percent (5%) or more of the gross from the vendors he permitted to bid for

---

[2]  It is our position that Mr. Rattoballi has substantially complied with the terms and conditions of the
cooperation agreement and has therefore earned a substantial sentence reduction.

the work.    Mosallem kept these companies on Grey's limited list of approved vendors so that he could steal from his own clients.

As the Court is aware, Mr. Mosallem entered a guilty plea to the charges against him at least in part based upon the fact that he knew Mr. Rattoballi was going to be a witness.   Mr. Rattoballi's cooperation with the government is certainly an additional factor that should be considered in determining the appropriate sentence to be imposed pursuant to 3553 (a) and 3661 of Title 18 of the United States Code.

## (e)    The Effect That a Jail sentence Will Have on Rattoballi's Business and Employees

At the sentence hearing, Mr. Rattoballi intends to introduce evidence of the unique role that he plays in the operation of his business and the likely result that will follow should he be imprisoned.

### Other Sentences

The primary focus of the government's investigation of Grey Advertising was the relationship between Grey executive, Mitch Mosallem, and the print vendor, Color Wheel.   Without question, Color Wheel owner, Haluk Ergulec, was the primary source of the  "kickbacks" demanded by Mosallem and other Grey executives as the cost of doing business with Grey. Throughout the 1990's, Color Wheel provided Grey employees with a vast array of secret services in exchange for a substantial share of the print business.   These services included, but were not limited to, the hiring of prostitutes, trips to Scores and trips to the VIP Lounge, expensive Manhattan strip clubs. Mosallem's office was also supplied with free tickets to virtually every significant event in town including New York Yankees games, Knicks games, concerts and shows at the Metropolitan Opera, all bankrolled by Mosallem's secret agreement with Color Wheel.   Mosallem shared these and other "freebies" with numerous Grey employees.    Mosallem's arrangement with Color Wheel allowed him solidify his power base at Grey where he eventually became known as "the godfather" because of his ability to get things for people.    During this time period, Grey's print budget with Color Wheel reached $6 million a year.

By contrast, Mr. Rattoballi's company, Print Technical Group (hereinafter "PTG"), was provided with sales of approximately $1 million per

year.    For this reason alone, the government's effort to compare Mr. Rattoballi to Haluk Ergulec and Color Wheel is misleading and unfair.    Nor did PTG engage in the extreme "anything goes" mentality that defined the relationship between Ergulec and Mosellam - No prostitutes and certainly no lap dances at strip clubs.  It was with Color Wheel's assistance that Mosallem turned Grey into a racketeering enterprise that forced printers and print brokers, like Jim Rattoballi, to pay a percentage of their earnings back to Grey.  In addition, while PTG was a profitable company, it was tiny compared to Color Wheel.  The payments made back to Grey executives came out of their profits from the jobs directed to them by Mosallem.

For comparison purposes only, Mr. Rattoballi's role in this offense is much more similar to a number of other individuals that have been caught up in the government's investigation of the advertising industry.  The two most similar are John Chessa and John Ghianni.  John Chessa was a print broker like James Rattoballi. His company, Total Concepts Graphics was limited to providing printing services to Grey.  Total Concepts share of the market was slightly less than PTG's.  On June 18, 2003, Mr. Chessa was sentenced to a term of 15 months in prison and was ordered to pay restitution in the amount of $196,675.00 by the Honorable Laura Taylor Swain, United States District Judge.    John Ghianni did plate work for Quality House of Graphics.    The share of Grey business received by this company was approximately $800,000.00 to 1 million dollars.  Mr. Ghianni was sentenced to probation and a fine of $30,000.00 and, like Mr. Rattoballi, one year of house arrest.

Interestingly, although the government initially appealed Mr. Ghianni's sentence, they eventually withdrew it.

## CONCLUSION

Regardless of whether these facts would justify a departure under Second Circuit pre-Booker departure precedent, there can be no doubt that now, after Booker, they may be relied on to justify a variance from the guidelines sentence under 1 8 U.S.C. § 3553(a).  This circuit's pre-Booker precedent precluded departures based on a variety of proffered grounds without a showing of a circumstance  not adequately taken into consideration by the Sentencing commission citing 18 U.S.C. § 3553(b)(1), later excised by the Booker remedy-majority opinion. The Court of Appeals often concluded that the district courts sidestepped circuit precedent noting the mandatory structure

of the sentencing guidelines.

After Booker, the converse must now be true. That is, now that the guidelines no longer bind the district court, the district court's attempt to avoid perceived unfairness must have greater weight.  Because § 3553(b)(1) has been excised, there is no longer any basis for precluding the reasons cited above as a basis for a sentence lower than the guidelines range. For the same reasons Rattoballi contends that a departure should be justified on the facts here, a variance from the guidelines range under § 3553(a)(6) is certainly justified.

For all these reasons, the Court should sentence Mr. Rattoballi to a sentence that does not include a term of imprisonment.  Such a sentence would comply with the statutory mandate to impose a sentence that is "sufficient, but not greater than necessary" to provide "just punishment", "adequate deterrence", "protect the public" and "provide the defendant with needed educational or vocational training... in the most effective manner."  18 U.S.C. § 3553(a)

Thank you very much for your consideration in this matter.

Respectfully submitted,

/S/

Steve Zissou

SZ/ja
cc: USDOJ (by ecf)